RECEIVED

FEB 29 2016

United States Court of Appeals
For The Federal Circuit

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT
16-1458

Petition for Review of Decision of

U. S. MERIT SYSTEM PROTECTION BOARD

DOCKET No. AT-0752-14-0666-I-1


Jarvis Mosley

Appellant,

v.

Anthony Foxx, Secretary

Dept. Of Transportation

Agency,                                   Date: February 26, 2016
••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••
BRIEF

Jarvis Mosley, Appellant, pro se, petitions for the review of the decision of the Merit

System Protection Board rendered December 3, 2015 for the following reasons:


BACKGROUND

1. The evidence reveals that Harold Baker was the Manager of the facility. He
   employed certified Air Traffic Controller's ATC's, such as Tommy Gould to train
   and evaluate the trainees, like Appellant.

2. Appellant, argued that Harold Baker's stated reason for suspending his training,
   and thus leading to his termination, was based a discriminatory motive and not a
   fair evaluation of his training progress.

RECEIVED

FEB 29 2016

United States Court of Appeals
For The Federal Circuit

3. Appellant and Gould testified that Baker was borderline overtly abusive in his treatment of Appellant.

4. The record reflects that Appellant's training history, consisted of On the Job evaluations of progress band Certification Skill checks.

5. Remarkably, Appellant produced evidence that reveals Baker to have illegally altered the evaluation score he received 8 weeks prior to the decision to terminate his training and in so doing, Baker forged the initials of Tommy Gould, the On the Job Training Instructor, (OJTI) on an official government document.

6. Gould testified that on or about June 28, 2013, Appellant had successfully completed his recorded training exercise, before OJTI Tommy Gould. Gould affixed Appellant's score on to the official government document, indicating satisfactory achievement.

7. However, Baker demanded Gould change his Appellant's score. When Gould, whose credibility was never questioned (unlike the confessed forger, Baker) refused, Harold Baker admitted in court to forging Gould's initials and altering the document to reflect a negative evaluation.

8. The offense of forgery is cited in the Agency's Code of Conduct and carries with it a penalty from Suspension to Removal for the First offense.

9. The record also reflects that Appellant passed his Certification Skill check, on or about August 6, 2013, but that Baker arbitrarily refused to record the Certification and instead required Appellant to pass his Certification twice.

Comment [JB1]:

Comment [JB2]:

10. The record reflects that unlike any other trainee, and in the opinion of Tommy Gould, the Instructor, and quite counter-productively, Appellant was subjected by Baker to 8 Certification Skill checks within a four week period.

11. The record reflects that after terminating Appellant's training and referring his training to the Training Review Board, (TRB), Baker submitted to the TRB an unrelated, ex parte and prejudicial police report concerning Appellant's off the job conduct.

12. That after the TRB recommended termination of training, Baker forwarded with the TRB's recommendation, a copy of said Police Report to Brian Lentini, who, subsequently thereafter decided to Terminate Appellant from the Federal Service.

13. That on October 27, 2013, Appellant requested a Reasonable Accommodation based upon the findings of depression and alcohol dependency by Psychiatrist, Sandra Thomas. That Baker replied by requesting a voluminous list of criteria from the medical professionals familiar with Appellant's condition.

14. That Appellant complied with the Agency response by forwarding Baker's request to Dr. Thomas, who thereupon provided a medical report.

15. That Baker, arbitrarily refused to consider and indeed provisionally denied Appellant's Accommodation request, citing failure to comply with his required answers.

16. That Appellant went to Dr. Thomas and informed her of Baker's rejection of the medical report. Dr. Thomas prepared a detailed report citing the Appellant's condition of Depression and Alcohol Dependency as being the result of the mistreatment Appellant received at Baker's hand. Dr. Thomas directly

recommended that Appellant, after having received treatment for his previously unaddressed condition be given the opportunity to resume training without the burden of his untreated conditions.

17. That Baker and Lentini refused to consider the medical report even though it was their duty to do so.

## NEWLY DISCOVERED AND OFFERED EVIDENCE

1. That pursuant to an independent EEO claim, based upon the same facts and instituted prior to his termination, based upon what Appellant considered to be violations of Title VII of the Civil Rights Act of 1964 (retaliation and discrimination) in his training, on February 5, 2015, an adjudicatory hearing was held before the EEOC, Administrative Judge Alison E. Smith-Lynn in Atlanta, Ga.

2. That the same witnesses who appear before the instant MSPB hearing, testified before the Court.

3. Alison E. Smith-Lynn, entered final judgment in EEOC NO. 410-2014-00316X. In said Decision, the Administrative Judge found that, among other things,

> "First and foremost, the undersigned did not find Mr. Baker to be a credible witness." (See attached Decision of the Court, Page 41 September 29, 2015)

4. That the final decision was mailed to the Appellant on November 6, 2015

5. That on November 16, 2015, an addendum was submitted to the MSPB Board in the instant appealed Petition for Review. Said addendum included the Courts determination of retaliation and discrimination in the training of the Appellant.

## ARGUMENT

I.     The Administrative Judge and indeed the Board, failed to adequately consider Harold
        Baker's forgery:

The Administrative Judge erred in his decision by looking only at the evidence that
supports the conclusion reached. In *Durr v. Dept. of Veterans Affairs*, 2013 MSPB 12,  AT-
1221-10-0216-W-2, (February 8, 2013), the Court, after finding that the agency met the clear and
convincing evidence burden, the initial decision did not fully evaluate the relevant evidence as
set forth in *Whitmore v. Department of Labor*, 680 F.3d 1353 (Fed. Cir. 2012).

In *Whitmore*, the court held that,

"[W]hether evidence is sufficiently clear and convincing cannot be evaluated by looking only
at the evidence that supports the conclusion reached. It stated that if "considerable
countervailing evidence is manifestly ignored or disregarded in finding a matter clearly and
convincingly proven, the decision must be vacated and remanded for further consideration so
that all the pertinent evidence is weighed." The court further stated that, in considering the
existence and strength of any motive to retaliate, "[t]hose responsible for the agency's
performance overall may well be motivated to retaliate even if they are not directly
implicated by the disclosures. There the Board concluded that the judge had not fully
addressed these matters as required by *Whitmore*. Because proper evaluation of this evidence
and argument may involve resolving conflicting evidence and testimony based upon the
demeanor of witnesses, the judge is in the best position to resolve such questions and remand
is appropriate." Id.

6

The question in the present case is whether the AJ fully considered Harold Baker's admitted forgery of an evaluative official government document, with the precise intent of adversely changing the recorded evaluation of the lead training instructor.

On page 11 of its Decision, the AJ categorized the forging of an official evaluative government document as "The [A]ppellant established that Baker changed the character of a document comment on one of [A]ppellant's training reports..." The AJ failed to consider that the record also revealed on the same document and testimony by both Baker and Gould, that Baker forged the initials of Gould, who vehemently disagreed with the adverse grade.

The AJ failed to consider that this was forgery, an officially numerated code of conduct violation and as such, Baker should have been subject to discipline, from a Suspension up to termination, for the first offense. Instead, the AJ declared that Appellant had not proven that a violation of a regulation occurred. A felony violation of the Code of Conduct should be considered as a violation of procedure.

The AJ also failed to consider that forgery is an accepted crime of "moral turpitude", and as such rebuts the general credibility of the witness. AJ failed to mention of any consideration or weighing of this admitted crime into the question as to the truth of Baker's subjective articulation of the Agency's alleged non-discriminatory reason for the adverse conduct.

The AJ failed to consider this outrageous conduct as indicative of the discriminatory animus Appellant had argued through a myriad of instances the sum total of which convincingly proves pretext. The logical inference from the forging of an evaluation score was "considerable countervailing evidence" and it was manifestly ignored by the AJ. Indeed, the AJ failed to

7

consider evidence of discriminatory intent by the circumstantial evidence associated with Baker's forgery;

a. Forging, falsifying, misstating or misrepresenting information on a Government document is an FAA Disciplinary offense (FAA Human Resources Operating Instructions, HROI) and punishable by a mandatory suspension through termination.

b. Forgery and alteration of a Trainer's evaluation is evidence of Baker's discriminatory intent to create a record upon which termination of training may be based.

c. Acknowledging of Appellant's successful completion of certification yet demanding that he do it again is evidence of discriminatory intent.

d. Conducting an unprecedented number of Certification Skill Checks within a drastically short period of time was deemed counterproductive by Gould, and is further evidence of an intent to set Appellant up to have his training terminated.

e. Comments by Gould to Baker that his-Baker's-conduct was discriminatory is evidence of Baker's discriminatory bias.

f. The improper disclosure of a police report to the Training Review Board can also in context, be viewed as a continuation of Baker's discriminatory scheme.

Thus the AJ erred in viewing the forgery as a mere "change [in] the character of a document" or that this was but a, "single error during one training session", as considerable countervailing evidence. (Decision pages 11 and 12, respectively).

The Board, on the Petition for Review merely sustained the AJ's decision without articulable justification and without examining the probative value as to altered documents used to

8

determine whether to suspend Appellant's training and credibility that the act of committing forgery infers/proves.

II.    The Administrative Judge failed to consider the retaliation of Baker against Gould as circumstantial evidence of discriminatory animus:

Again, Appellant reasserts the above argument as to the Board's decision merely rubber stamping the AJ's decision.

As above, AJ erred by failing to consider the fact that Tommy Gould, in his testimony, reported his observations of Baker's discrimination first to Baker himself and then to Brian Lentini and his designee. Incredibly, Gould related that the day after given his account to management, he was retaliated against the next day when Baker sabotaged his promotion with false and misleading recommendation. Such retaliation is also evidence of discriminatory animus towards Appellant.

III.    The Administrative Judge failed to consider the unprecedented number of Certification Skill checks as evidence of policy deviation and circumstantial evidence of discriminatory animus:

As to the Decision's ruling on the number of Certifications Skill Checks given in August 2013, the AJ found only that Appellant didn't cite specific a regulation regarding the number of Certification Skill Check that could be given in a set amount of time. (Decision page 12). (Under that logic, if Appellant had been given 10 such evaluations in one day, that fact would be unpersuasive without a specific regulation). The AJ erred in this instance, by failing to consider

9

the countervailing evidence provided by Gould's testimony that the established practicing policy was breached by the unprecedented number of Certification Skill checks in the space of 4 weeks.

According to Gould, Appellant's chief trainer, the number of Certification Skill checks within that period of time was, under the circumstances of Appellant, measurably counterproductive, if not punitive. Thus this also violated the *Whitmore* decision and reasoning.

IV.    The Administrative Judge improperly applied the Convincing Mosaic test —
       Retaliation:

The record reflects that immediately after a Certification Skill check of August 6, 2013, in which Appellant and Baker agree that he passed his Certification Skill check, but was nevertheless denied certification by Baker, Appellant contacted an EEO counselor. Thereafter, Appellant was subject to an unprecedented number of back to back to back... Certification Skill checks, with no time for reflection as was the policy at that time (as testified to by Gould).

In addition to the unreasonable and disparate number of evaluations, (deemed by Gould as obviously counterproductive), Appellant indicated that one of those evaluations was conducted without the required notice.

AJ filed to consider this violation of as violative of regulations, (Exhibit D Job Order 3120.4N— 6. Certification Skill Checks which mandates trainees be notified prior to all such examinations. Recognition of this as discriminatory, material harmful procedural error, or even as part of the mosaic of retaliation is error.

The Court in Coleman v. Donahoe, 10-03694, (Court of Appeals 7th Cir. 2012), reviewed Coleman's retaliation claims under the direct method of proof, finding that her disparate

10

treatment and the closeness in time between her complaints of discrimination and her firing created a "convincing mosaic of circumstantial evidence" that would permit the inference of retaliation. Coleman then filed a petition for review with the EEOC. She challenged the administrative judge's formulation of the "convincing mosaic" evidentiary standard for establishing retaliation, arguing that it is greater than the "preponderance of the evidence" burden required to prove Title VII claims, and she argued that the EEOC should reject the administrative judge's formulation of the standard.

In its decision, the EEOC first clarified its view about the role of the "convincing mosaic" in federal sector retaliation cases. Davis v. Department of the Interior, EEOC Petition No. 0320110050 at 11-12 (July 16, 2014). The EEOC explained that the "convincing mosaic" is "a useful way to describe how several facts may add up to sufficient evidence to discredit an employer's explanation and demonstrate a causal connection between the prior protected activity and the challenged adverse action." Id. at 12. The EEOC stated that it did not intend to promulgate a new standard whereby circumstantial evidence in a retaliation case must have a mosaic-like character, or to require appellants to meet a more demanding evidentiary standard, and that it also did not intend to state a preference for one evidentiary framework over another, but, rather to indicate that, under certain evidentiary scenarios, the "convincing mosaic" can serve as a useful option for establishing the causal connection in retaliation cases. The EEOC found that the Board's administrative judge erred in insisting that an appellant "must" provide evidence showing a "convincing mosaic" of retaliation in order to prove retaliation using circumstantial evidence. Id.

In the present case it is abundantly clear that Appellant established the requisite circumstances which ought to have led the AJ to the conclusion that it is more probable than not

that Baker knew that Appellant had exercised his protected activity prior to being placed at the facility. Indeed that was how Appellant was so placed. Additional the facts demonstrate that after being counseled by Tommy Gould on possible EEO violations by Baker against Appellant and after Appellant contacted the EEO Counselor, on or about August 6, 2013, Baker thereupon

1. Instituted an unprecedented number of Certification Skill checks—aimed at overwhelming and sabotaging Appellant's training progress.

2. Conducted a Certification Skill check without first giving required notification.

3. Suspended Appellant's training even though Appellant had successfully passed his August 6, 2013 Certification Skill check.

4. Improperly disclosed a Police Report to the TRB before its deliberation and decision to terminate training.

5. Improperly forwarded a copy of said Police Report to Brian Lentini prior to his decision to Terminate from the Federal Service.

6. Refused to consider competent medical opinion as to Appellant's disability and the Agency's contribution to said condition.

7. Failed to consider Appellant's request for Reasonable Accommodation made pursuant the medical report

At the end of any discussion on the quantum of proof, the bottom line is and the record reflects that, a convincing mosaic of circumstances had been established in this case to warrant the inference of retaliation. Whatever the classification or description, the AJ erred by not considering and articulating the weight of the credible countervailing evidence of the component parts of the "mosaic".

12

V.    Disability consideration—

Appellant established through Dr. Thomas' report that he had Depression, a mental impairment, which the medical documentation and Appellant indicated, effected his ability to concentrate, and thus adequately perform his trainee duties. The AJ agreed," I find that Dr. Thomas's statement was sufficient to establish that the appellant was 'substantially limited' with respect to these major life activities". (Decision page 18) The AJ found Appellant to be "an individual with a 'disability' as that term is defined for the purposes of the ADAAA." (Decision page 18).

However, the AJ noted that Appellant's request for accommodation came after his training had been terminated. What the AJ failed to cite was that Appellant was still an employee in good standing at that time and had been assigned to perform non-safety related duties. In fact Appellant continued to be employed approximately 5 months after his request for accommodation. The ADA does not preclude an employee with a disability from requesting a reasonable accommodation because s/he did not ask for one when applying for a job or after receiving a job offer. Rather, an individual with a disability should request a reasonable accommodation when s/he knows that there is a workplace barrier that is preventing him/her, due to a disability, from effectively competing for a position, performing a job, or gaining equal access to a benefit of employment. *Masterson v. Yellow Freight Sys.*, Inc., Nos. 98-6126, 98-6025, 1998 WL 856143 (10th Cir. Dec. 11, 1998) (fact that an employee with a disability does not need a reasonable accommodation all the time does not relieve employer from providing an accommodation for the period when he does need one).

13

The AJ failed to recognize that the Agency did absolutely nothing with respect to Appellant's request. There was no interactive process, as proscribed. The Agency never sat down to discuss other positions for which Appellant could perform while he was in treatment. Nor did the Agency even consider the recommendations of Dr. Thomas. All it had to do was contemplate the medical recommendation and if convenient, implement them. In light of the medical conclusion the rapid fire Certification Skill checks may be seen in a different light. But the Agency simply ignored the request, period. The AJ instead found that, "the agency was not required to excuse appellant's prior performance". (Decision page 19).

According to the ADA, an employer should respond expeditiously to a request for reasonable accommodation. If the employer and the individual with a disability need to engage in an interactive process, this too should proceed as quickly as possible. Dalton v. Subaru-Isuzu Automotive, Inc., 141 F.3d 667, 677 (7th Cir. 1998). Similarly, the employer should act promptly to provide the reasonable accommodation. Unnecessary delays can result in a violation of the ADA. In determining whether there has been an unnecessary delay in responding to a request for reasonable accommodation, relevant factors would include: (1) the reason(s) for the delay, (2) the length of the delay, (3) how much the individual with a disability and the employer each contributed to the delay, (4) what the employer was doing during the delay, and (5) whether the required accommodation was simple or complex to provide.

However, in the present case, the AJ made no such analysis. After Appellant's training had been suspended August 28, 2013. The Appellant continued to be an employee in good standing. After Dr. Thomas' examination diagnosis and Appellant promptly, October 28, 2013, informed the Agency of his disability requested an accommodation. This occurred prior to the November submission of the recommendation from the TRB to the National Employee Services

14

Team (NEST). The Agency and the AJ reasoned that the ADA did not apply to this category of employee, at this time. That is plain error.

VI.    The Administrative Judge erred in failing to rule that introducing the Appellant's unrelated Police Report into the evaluation and review process was harmful error and violative of due process:

The Appellant's disability was ignored even though it was communicated and established well before the Agency decision to terminate from the federal service. However, Harold Baker included an unrelated, prejudicial, Police Report in the deliberations of the TRB. Further, Baker made sure that this ex parte communication, not the medical report which explained Appellant's performance, was sent directly to Lentini prior to his decision to fire Appellant. The AJ failed to view the introduction of a Police Report to the Training Review Board (TRB) as being violative of due process. Again the AJ pointed to the lack of a specific Agency policy or regulation cited but forgot the federal due process implications that apply independent of any specific regulation.

The AJ erred by not following the analysis as the Court directed under *Stone v. Fed. Deposit Ins. Corp.*, 179 F.3d 1368 (Fed. Cir. 1999) and *Ward v. U.S. Postal Service*, 634 F.3d 1274 (Fed. Cir. 2011). In those cases the Court instructed that when an employer obtains new and material information through ex parte communications, an employee's constitutional due process guarantee of notice and the opportunity to respond are undermined. Where an employee has notice only of certain charges or portions of the evidence and the deciding official considers new and material information, procedural due process guarantees are not met because the employee is no longer on notice of the reasons for dismissal and/or the evidence relied upon by the agency. By including the Police Report in the deliberative process, Agency violated Appellant's

15

due process rights.

In *Stone*, the court identified factors to consider when determining if new and material information has been introduced: (1) whether the ex parte communication introduces "cumulative" information or new information; (2) whether the employee knew of the communication and had a chance to respond to it; and (3) whether the ex parte communication resulted in undue pressure upon the deciding official to rule in a particular manner.

In *Wilson v. Dept. of Homeland Security*, 2012 MSPB 56, DC-0752-10-0706-I-1 (April 17, 2012), the Court reasoned that when a deciding official receives new and material information by means of ex parte communications, "then a due process violation has occurred and the former employee is entitled to a new constitutionally correct removal procedure." Ultimately, the question is whether the ex parte communication is so substantial and so likely to cause prejudice that no employee can fairly be required to be subjected to a deprivation of property under such circumstances. These rules apply not only to whether a charge of misconduct can be sustained but also to whether the ex parte communication affected the selection of the penalty to be imposed. The police incident report is an ex parte communication. The introduction of a police report for a DUI, is so inflammatory as to meet the *Wilson* test.

Finally, the Appellant presented the Board with the decision of the EEOC, a Court of competent jurisdiction and a decision rendered based on the same facts, as was before the Board. That Judge determined that considering the forged document, it was clear that Baker discriminate and retaliated and that he had no credibility. This new evidence, as to retaliation, discrimination and credibility of Harold Baker was never considered by the Board.

## CONCLUSION

Often these matters which involve discrimination and wrongful termination are decided on the ability of the trier's to discern the origins of what President Obama eulogized as, "that subtle impulse" that leads to discriminatory acts. Far too often that proves to be a bridge too far for most, and the pitiful statistics bear that out. But in this matte, a courageous and honest man, Tommy Gould, set from behind the curtain to illuminate the truth. Gould established that Harold Baker discriminated against Appellant in his training and committed obvious forgery in the attempt to construct a reason to terminate training. Baker poisoned the well of both the TRB and NEST, as well as the deciding official Brian Lentini's decisions by introducing an unrelated police report. The Agency failed to even consider a qualified employee with a disability's request for accommodation. The AJ erred in ignoring substantial countervailing evidence and mis-applied principles of law in this matter. But even more erroneous was the refusal to consider the substantial evidence of a lack of credibility on behalf of Harold Baker

Wherefore, Appellant requests that the AJ's and Board's decision be reversed and that he be granted such other and further relief as justice and the nature of his cause require. Respectfully submitted,

Jarvis Mosely, pro se

## CERTIFICATE OF SERVICE

I hereby certify that on the 26 day of February 2016, a copy of the above Brief
Will be sent via U.S. mail, to Alison Vicks

U.S. Mail     Respondent

Alison Vicks

United States Department of Justice, Commercial Litigation Branch

PO BOX 480, Ben Franklin Station

Washington, DC 20044

/s/
Jarvis Mosley

# UNITED STATES OF AMERICA

# MERIT SYSTEM PROTECTION BOARD

**Jarvis Mosley**

**Complainant,**                                      **DOCKET No. AT-0752-14-0666-I-1**

        **v.**

**Anthony Foxx, Secretary**

**Dept. Of Transportation**

**Agency,**                                      **Date: November 16, 2015**

## ADDENDUM TO PETITION FOR REVIEW

Jarvis Mosley, Complainant, does hereby and through his representative, H. Jerome Briscoe, submit this Addendum to the Petition for Review of the decision of the Administrative Judge rendered June 2, 2015 for the following reasons:

1. Appellant an Air Traffic Controller, who was transferred from Florence, S.C. to Columbus Georgia, in July 2011.

2. The reason for the transfer was a result of an EEO complaint.

3. Harold Baker was the first and second line Supervisor at that location.

4. Appellant initially contacted the EEO counselor on September 3, 2015, on the issue of discrimination and retaliation by the Agency (Harold Baker) in evaluating his training.

5. The original and above captioned Petition is pending before the Board, on an appeal from the Initial Decision for Appellant's termination.

6. Subsequent to the filing of the instant Petition for Review, the Agency submitted to the Administrative judge at the EEO, the MSPB's Initial Decision in its Pre-hearing submissions before the EEOC, in a matter of the discrimination of Appellant by the Agency—under the identical facts and with the same witnesses.

7. On or about October 3, 2015, the United States Equal Employment Opportunity Commission transmitted to Appellant, a Decision rendered on, or about July 30, 2015.

8. EEOC's Decision pertained to the issue of Agency's Discrimination and Retaliation; on the identical factual circumstances as in the present case. (See Attached).

> Attached: In its July 30, 2015 "Decision", on Page 2,
>
> *"[T]his decision finds that the Respondent Agency, the Department of Transportation, Federal Aviation Administration (FAA), discriminated against the Complainant) [Appellant] based on his race (African-American), gender (Male) and reprisal (for EEO) when:1) he was subjected to unfair training conditions and prejudiced by his supervisor and, 2) on August 26, 2013, his training was suspended then terminated."* (See Attached).

9. The instant Appeal contends that the forgery of a performance evaluation form which was part of the basis for the decision to suspend training and terminate, is evidence of harmful error in the assessing of Appellant's training performance.

10. As to the assertion of judicial error, it is plain error not to consider that due to the forgery, Baker lacked any credibility.

11. The attached Decision, from a Court of comparable jurisdiction, on the same facts, and on the issue --affirmative defense

of discrimination and retaliation—raised in the instant case—establishes legal precedence, as well as overwhelming factual evidence,  and a Court opinion as to;

1) Discrimination; and

2) Retaliation,

7.  The EEOC proceeding revealed evidence of a lack of credibility with Harold Baker when considering the identical fact pattern as in this case.

8.  The EEOC enabled the Court, through enhanced examination, to hone in on the singular issue, that of Discrimination—which was Appellant's Affirmative Defense in his MSPB appeal.

WHEREFORE, Appellant requests that this Addendum be considered by the Board, and that,

a.  The Initial Decision be Reversed with a Judgment to the Appellant,

b.  That the Initial Decision be Vacated and Remanded to an Administrative Judge,

c.  That Appellant be given such other and further relief as justice and the nature of his cause require.

Respectfully submitted,
   /s/
H. Jerome Briscoe—Representative of Jarvis Mosley
60 FM 3179
Huntsville, TX 77340
(936) 662-3785
jeromebriscoe@live.com.

## CERTIFICATE OF SERVICE

I hereby certify that on the 16ᵗʰ  day of November, 2015, a copy of the above Addendum to Petition for Review.

Will be sent via electronic mail, to Jennifer Ambrose at jennifer.ambrose@faa.gov.

/s/

H. Jerome Briscoe

UNITED STATES OF AMERICA
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
ATLANTA DISTRICT OFFICE

JARVIS O. MOSLEY,

    Complainant,

  vs.

ANTHONY R. FOXX,
SECRETARY,
DEPARTMENT OF TRANSPORTATION,

    Agency.

EEOC No.
410-2014-00316X

AGENCY No.
DOT/2013-25317-FAA-03

Dated: September 29, 2015

## AWARD OF COMPENSATORY DAMAGES

  Having found that the Agency discriminated against the Complainant based on his race (African American) and gender (male), and based on reprisal (for prior EEO activity), when: 1) he was subjected to unfair training conditions and prejudged by his supervisor; and 2) on August 26, 2013, his training was suspended and then terminated, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, a damages hearing was held on September 25, 2015.

  As relief in this case, the Complainant has requested compensatory damages,[1] which are available pursuant to Section 102(a) of the Civil Rights Act of 1991, 42 U.S.C. § 1981a. The Complainant is entitled to compensatory damages for past and future pecuniary losses (*i.e.*, out-

---

[1] The Complainant has requested neither reinstatement nor attorneys' fees. In addition, because the discrimination at issue occurred while the Complainant was employed and being paid by the Agency, back pay is not appropriate in this case.

1

of-pocket expenses incurred as a result of the Agency's discriminatory conduct), and for non-pecuniary losses (*i.e.*, losses that cannot be quantified through objective measures for injuries that are largely subjective in nature) for emotional harm if he is successful in showing that he suffered these losses and that they were the result of the discrimination found in this case. *See Androvich v. Secretary of Agriculture*, EEOC Appeal No. 01950531 (July 12, 1996). The Complainant bears the burden of demonstrating that he has been harmed as a result of the Agency's discriminatory action; the extent, nature, and severity of the harm; and the duration or expected duration of the harm. *Rivera v. Dept. of the Navy*, EEOC Appeal No. 01934157 (July 22, 1994); EEOC Notice No. N 915.002 (July 14, 1992).

### Past Pecuniary Damages

"Past pecuniary losses are the pecuniary losses that are incurred prior to the resolution of a complaint via a finding of discrimination, an offer of full relief, or a voluntary settlement." *Brinkley v. Postmaster General*, EEOC Appeal No. 01953977 (Jan. 23, 1998) (citing EEOC Notice No. N 915.002 (July 14, 1992), at 8-9). The Complainant submitted evidence that he has incurred $210 in out-of-pocket expenses for counseling services between July 14, 2014, and October 23, 2014. The evidence presented during the damages hearing demonstrates that the Complainant has experienced extreme depression, anxiety, and other forms of emotional distress as a direct result of the Agency's discriminatory conduct. I find that the Complainant's mental and emotional distress, which resulted from the discriminatory treatment to which he was subjected, warranted his need for counseling services during the time period in question, and that the $210 request is reasonable under the circumstances. Accordingly, I find that the Complainant is entitled to $210 in past pecuniary damages.

2

The Complainant and his wife testified during the hearing that they incurred additional expenses during the relevant time period, at least in part as a result of the discrimination. The additional expenses included over $7,200 spent on an attorney to represent the Complainant in connection with a criminal matter; approximately $11,000 spent on the Complainant's in-patient hospital stay; and approximately $60,000 in student and personal loans. I find that the attorney's fee are not sufficiently related to the discrimination in this case to qualify as a past pecuniary expense. I find it to be undeterminable whether the $11,000 expense is sufficiently related to the discrimination at issue. The Complainant has not submitted any objective evidence that indicates he incurred this expense, and which portion of the expense, if any, may have been covered by his health insurance. Finally, in regards to the loans, I find that some, if not all, of the student and personal loans were taken out while the Complainant was still employed and being paid by the Agency. I further find that the evidence produced during the hearing indicated that the loans were taken out in large part to cover the Complainant's wife's law school expenses. In short, the Complainant produced no evidence that directly connects the student and personal loans to the discrimination in question. Like the attorney's fee and hospital expenses, the Complainant submitted no objective evidence whatsoever related to these loans. Accordingly, I find that the Complainant's attorney's fee, hospital stay, and loan expenses do not qualify as past pecuniary expenses.

**Future Pecuniary Damages**

"Future pecuniary losses are losses that are likely to occur after resolution of a complaint." *Androvich, supra* (citing EEOC Notice No. N 915.002 (July 14, 1992), at 9). The Complainant's physician testified during the hearing that the Complainant is likely to require

3

mental health treatment (to include counseling and medication) for a variety of symptoms, including depression and anxiety, among others, for the foreseeable future. The only objective evidence that the Complainant produced in connection with his ongoing medical expenses indicates that he will be responsible for a twice-monthly $35 co-pay for counseling services.[2] Given my aforementioned determination that the discrimination in question has caused the Complainant significant mental and emotional distress, such that mental health services are appropriate, and in the absence of any specific and identified end-point, I find that the Complainant is entitled to $70 per month for a period of three years, which amounts to $2,520 in future pecuniary damages.

**Non-Pecuniary Damages**

Non-pecuniary damages (pain and suffering) are often difficult to determine, and there are no definitive rules governing the amount to be awarded in given cases. While there is no precise formula for determining the amount of damages for non-pecuniary injuries, an award of compensatory damages should reflect the extent to which the Agency's discriminatory action directly or proximately caused the harm, the nature and severity of the harm, and the length of time that the injured party has suffered from the harm. While medical documentation is generally required, its absence does not preclude an award of non-pecuniary damages. The testimony of the Complainant or other witnesses may support such an award. *See* Compensatory and Punitive damages available under Section 102 of the Civil Rights Act of 1991, EEOC Notice No. 915.002 (1992), at 10-11. Nevertheless, the Commission has held that a proper non-pecuniary damages award must meet three goals: (1) it should not be "monstrously excessive"

---

[2] The Complainant presented no objective evidence regarding the cost of his ongoing medication expenses.

standing alone; (2) it should not be the result of passion or prejudice; and (3) it should be consistent with awards made in similar cases. *Olsen v. Secretary of Defense*, EEOC Appeal Nos. 01956675, 01966077 (July 29, 1998). Finally, the Commission applies the principle that in the damages context, one who discriminates takes the victim of discrimination as he finds him or her, regardless of whether the victim's reaction to the discrimination is consistent with that of a reasonable person. *Smith v. Dept. of Veterans Affairs*, EEOC Appeal No. 01A01738 (Sept. 23, 2002).

The discrimination at issue in this case took place over a period of approximately two years. During that time, the Complainant was repeatedly subjected to degrading and abusive treatment on the part of his supervisor as he sought to obtain his certification as an Air Traffic Controller. As a result of his mistreatment, the Complainant experienced a wide range of emotional, mental, and physical symptoms. The Complainant's physician (Dr. Sandra Thomas, M.D.) listed the following symptoms in her August 2015 report on the Complainant's condition: alcohol dependence, depression, anxiety, mistrust of people, decreased appetite and associated weight loss, headaches, insomnia, decreased focus at work, and negative changes to his self-esteem, core beliefs, mood, behaviors, and relationships. Dr. Thomas testified during the hearing that the Complainant is taking Zoloft® to treat his depression and anxiety, together with another medication for his insomnia, and that she cannot predict at this point when he may improve such that the medication will no longer be necessary.

The Complainant's wife (Chiquita Hill) testified during the hearing that the Complainant's self-worth was directly connected to his supervisor's opinion of him, and that as his supervisor's criticism and abuse increased, so did the Complainant's stress and related

5

symptoms. Ms. Hill testified that during the two-year period when the discrimination was occurring, the Complainant turned to alcohol as a result of the stress, that he had trouble sleeping, experienced migraine headaches and decreased intimacy, became irritable and depressed, and was even inconsolable at times.

The Complainant testified during the hearing that he felt humiliated and betrayed by his supervisor, and that as a result he developed migraine headaches for the first time in his life, experienced a low sex drive, decreased appetite, anxiety, depression, confusion, and insomnia. The Complainant also testified that he attempted to commit suicide in September 2013, just after learning that his training was being terminated. He stated that after being directed to pull his car over by a police officer, he refused to stop, traveling at a speed of between 90 and 100 miles per hour for five to ten minutes before crashing into a wall. The Complainant suffered a broken arm and leg in the accident, and shortly afterward voluntarily checked into a mental health and chemical dependency treatment facility for several weeks. Since that time, the Complainant has seen a counselor on a continuous basis to address the continuing effects of the discriminatory treatment.

The Commission has awarded non-pecuniary damages in similar cases involving discrimination resulting in severe emotional distress, including humiliation, embarrassment, depression, anxiety, insomnia, and attempted suicide. *See Ollson v. Dept. of Veterans Affairs*, EEOC Appeal No. 07A40001 (Apr. 28, 2005) (affirming award of $75,000 in non-pecuniary damages where the discrimination caused the complainant to experience[ ] . . . an attempted suicide, inability to sleep, social withdrawal, lack of interest in personal hygiene, and more"); *Tyler v. U.S. Postal Service*, EEOC Appeal No. 01A31207 (Feb. 23, 2004) (affirming award of

6

$80,000 in non-pecuniary damages where the discrimination caused the complainant to suffer "severe emotional distress, financial hardship, marital strain that eventually led to divorce, insomnia, embarrassment and depression . . . [and] attempted suicide"); *Smith, supra,* EEOC Appeal No. 01A01738 (increasing non-pecuniary damages award from $30,000 to $80,000 where the "complainant suffered severe stress, was diagnosed with acute depression with suicidal thoughts, attempted suicide, had trouble concentrating, reported somatic complaints, had frequent contact with a psychologist, suffered contusions on his arm, had sleeplessness, had a nervous breakdown, and was hospitalized several times for stress and suicide attempts.").

After analyzing all of the evidence, which establishes that the Complainant has experienced and continues to experience severe emotional distress, including depression, anxiety, mistrust of others, insomnia, and other symptoms directly resulting from the discriminatory conduct at issue in this matter, and upon consideration of the nature, extent, and duration of the Complainant's symptoms, I find that the Complainant is entitled to an award of non-pecuniary damages in the amount of $80,000. I find that this amount is not "monstrously excessive" standing alone, that it is not motivated by passion or prejudice, and that it is consistent with the non-pecuniary damages awards in similar cases.

## CORRECTIVE ACTION

Given the finding of discrimination in this complaint, the Complainant is entitled to be made whole as a matter of law, by being placed "as near as may be, in the situation he would have occupied if the wrong had not been committed." *Albermarle Paper Co. v. Moody,* 422 U.S. 405, 418-19 (1975).

7



## NOTICE

*TO THE AGENCY:*

Within forty (40) days of receiving this decision and the hearing record, you are required to issue a final order notifying the Complainant whether or not you will fully implement this decision. You should also send a copy of your final order to the Administrative Judge.

Your final order must contain a notice of the Complainant's right to appeal to the Office of Federal Operations, the right to file a civil action in a federal district court, the name of the proper defendant in any such lawsuit, the right to request the appointment of counsel and waiver of court costs or fees, and the applicable time limits for such appeal or lawsuit. A copy of EEOC Form 573 (Notice of Appeal/Petition) must be attached to your final order.

If your final order does not fully implement this decision, you must simultaneously file an appeal with the Office of Federal Operations in accordance with 29 C.F.R. § 1614.403, and append a copy of your appeal to your final order. *See* EEOC Management Directive 110 (EEO MD-110), August 5, 2015, Appendix O. You must also comply with the Interim Relief regulation set forth at 29 C.F.R. § 1614.505.

*TO THE COMPLAINANT:*

You may file an appeal with the Commission's Office of Federal Operations when you receive a final order from the Agency informing you whether the Agency will or will not fully implement this decision. 29 C.F.R. § 1614.110(a). From the time you receive the Agency's final order, you will have thirty (30) days to file an appeal. If the Agency fails to issue a final order, you have the right to file your own appeal any time after the conclusion of the Agency's forty (40) day period for issuing a final order. *See* EEO MD-110, Ch. 9(II)(A)(1)(c)((3)). In either

9

case, please attach a copy of this decision with your appeal.

Do not send your appeal to the Administrative Judge. Your appeal must be filed with the Office of Federal Operations at the address set forth below, and you must send a copy of your appeal to the Agency at the same time that you file it with the Office of Federal Operations. In or attached to your appeal to the Office of Federal Operations, you must certify the date and method by which you sent a copy of your appeal to the Agency.

*WHERE TO FILE AN APPEAL:*

All appeals to the Commission must be filed by mail, hand delivery or facsimile.

BY MAIL:

Director, Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 19848
Washington, D.C. 20036

BY PERSONAL DELIVERY:

Director, Office of Federal Operations
Equal Employment Opportunity Commission
1801 L Street, NW
Washington, D.C. 20507

BY FACSIMILE:

Number: (202) 663-7022

*Facsimile transmissions of more than ten (10) pages will not be accepted.*

## COMPLIANCE WITH AN AGENCY FINAL ACTION

Pursuant to 29 C.F.R. § 1614.504, an Agency's final action that has not been the subject of an appeal to the Commission or a civil action is binding on the Agency. If the Complainant believes that the Agency has failed to comply with the terms of this decision, the Complainant

10

shall notify the Agency's EEO Director, in writing, of the alleged noncompliance within 30 days

of when the Complainant knew or should have known of the alleged noncompliance. The

Agency shall resolve the matter and respond to the Complainant in writing. If the Agency has

not responded to the Complainant, in writing, or if the Complainant is not satisfied with the

Agency's attempt to resolve the matter, the Complainant may appeal to the Commission for a

determination of whether the Agency has complied with the terms of its final action. The

Complainant may file such an appeal 35 days after serving the Agency with the allegations of

non-compliance, but must file an appeal within 30 days of receiving the Agency's determination.

A copy of the appeal must be served on the Agency, and the Agency may submit a response to

the Commission within 30 days of receiving the notice of appeal.


DONE AND ORDERED this 29th day of September, 2015.

Allson E. Smith-Lynn
ADMINISTRATIVE JUDGE


11

UNITED STATES OF AMERICA
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
ATLANTA DISTRICT OFFICE

In the Complaint of:

-------------------------------

Jarvis O. Mosley,                   )
                                    )
        Complainant,                ) EEOC No.
                                    ) 410-2014-00316X
        vs.                         )
                                    ) Agency No.
Anthony R. Foxx, Secretary          ) DOT/2013-25317-FAA-03
Department of Transportation,       )
                                    )
        Agency.                     )

- - -

Decision of Alison Smith-Lynn,

Administrative Judge, in the above-styled case,

transcribed by Renee Bergeron-Teel, CCR-RDR.

----------------------------------------------------------

REGENCY-BRENTANO, INC.

Certified Court Reporters

13 Corporate Square

Suite 140

Atlanta, Georgia   30329

(404) 321-3333

## DECISION

Pursuant to notice, the above-styled complaint came to be heard by the Equal Employment Opportunity Commission, Atlanta District Office, on February 5, 2015, Alison Smith-Lynn, Administrative Judge, presiding.

APPEARANCES:

For the Complainant: H. Jerome Briscoe, Esquire

For the Respondent Agency: Jennifer Dorn Ambrose, Esquire and Ryan Landers, Esquire

## I.    SUMMARY

This decision finds that the Respondent Agency, the Department of Transportation, Federal Aviation Administration (FAA), discriminated against the Complainant based on his race (African-American), gender (male) and reprisal (for EEO activity) when: 1) he was subjected to unfair training conditions and prejudged by his supervisor; and 2) on August 26, 2013, his training was suspended then terminated.

This decision finds that the Respondent Agency, FAA, did not discriminate against the Complainant based on his race (African-American), gender (male), disability (alcohol dependence) and/or EEO activity when: 3) after disclosing the nature of

his disability, and requesting a reasonable accommodation, his training was terminated at the Columbus ATCT on November 4, 2013.

This decision finds that the Respondent Agency, FAA, did not discriminate against the Complainant based on his race (race (African-American), gender (male), disability (alcohol dependence) and/or EEO activity when: 4) his request for a reasonable accommodation was denied when, on November 4, 2013, he was not assigned administrative duties, and told to not report to work.

## II.    JURISDICTIONAL STATEMENT

This case arises under Title VII of the Civil Rights Act, as amended, 42 USC 2000(e) et. seq. and the Rehabilitation of 1973, 29 USC Section 701 et. seq, as amended.    Authority to conduct this hearing and to issue this decision is found in 29 C.F.R. § 1614.101 et seq. (1999) of the Equal Employment Opportunity Commission's (EEOC) regulations that pertain to federal sector equal employment opportunity.

### III.  INTRODUCTION

On February 5, 2015, I conducted a hearing on the EEO complaint of Jarvis O. Mosley (hereinafter referred to as "Complainant") against the Department of Transportation, Federal Aviation Administration (hereinafter referred to as "Agency").  The Complainant asserts that the Agency discriminated against him based on his race, sex, disability and EEO activity. The Complainant testified at the hearing and called Harold Baker (Caucasian, male, no disability, no EEO activity), Brian Lentini (Caucasian, male, no disability, no EEO activity) and Tommy Gould (Caucasian, male, no disability, EEO activity). The Agency called Dr. John Barson (Caucasian, male, disability, no EEO activity). H. Jerome Briscoe, Esq. represented the Complainant and Jennifer Dorn Ambrose, Esq. and Ryan Landers, Esq. represented the Agency.

### IV.  PROCEDURAL HISTORY

The Complainant initially contacted an EEO counselor on September 3, 2013, alleging discrimination based on his race (African-American), gender (male), disability (alcohol dependency) and/or reprisal (for EEO activity) when: 1) he was subjected

to unfair training conditions and prejudged by his supervisor; 2) on August 26, 2013, his training was suspended then terminated; 3) after disclosing the nature of his disability, and requesting a reasonable accommodation, his training was terminated at the Columbus ATCT on November 4, 2013; and 4) his request for a reasonable accommodation was denied when, on November 4, 2013, he was not assigned administrative duties and told to not report to work. The EEO counselor was unable to resolve the matter through informal inquiry, and served the Complainant with a Notice of Right to File a Discrimination Complaint. The Complainant filed a formal complaint on November 5, 2013.[1] The matter was investigated and a Report of Investigation (hereinafter "ROI") was completed on or around March 28, 2014. Subsequently, the Agency informed the Complainant of his right to a final agency decision with or without a hearing before an EEOC Administrative Judge. Thereafter, the Atlanta District Office received a request for a hearing from the Complainant. The Agency forwarded the file to the instant office. By Pre-hearing Order, a pre-hearing conference and hearing were scheduled. The hearing was held on February 5, 2015.

## V.  ISSUES

Whether the Agency discriminated against the Complainant based on his race (African-American), gender (male), disability (alcohol dependency) and/or reprisal for his participation in protected activity when:

A.  He was subjected to unfair training conditions and prejudged by his supervisor;

B.  On August 26, 2013, training was suspended and then terminated;

C.  After disclosing the nature of his disability and requesting a reasonable accommodation his training was terminated at the Columbus ATCT on November 4, 2013; and

D.  His request for reasonable accommodation was denied when on November 4, 2013, he was not assigned administrative duties and told to not report to work.

## VI  FINDINGS OF FACT

The circumstances surrounding the complaint are detailed in the ROI, including various affidavits and documentary evidence.  All evidence presented at the hearing has been considered although not specifically noted in this decision.  After reviewing

the evidence in the record and the evidence presented at the hearing, I find that the relevant facts may be summarized as follows:

At the time of the events discussed herein, the Complainant, an African-American, male, was an Air Traffic Control Specialist (ATCS) in Columbus, GA. See ROI 60. Complainant was transferred to Columbus, GA in July, 2011 as a result of a settlement of a prior EEO complaint filed against the Florence, South Carolina facility. See Hearing Transcript (HT) 256. Mr. Harold Baker (Caucasian, male, no disability, no EEO activity), Manager Traffic Control Tower, was the Complainant's first-line supervisor at the Columbus facility. See HT 16. Mr. Brian Lentini (Caucasian, male, no disability, no EEO activity) was the District Manager for the Southeast and the second-level supervisor for the Complainant. See HT 183.

According to the Complainant, he has alcohol dependency and depression. See ROI 61. He explained that he was diagnosed with this condition in September 2013. See, id. He explained that as a result of his disability his major life activity of concentrating is substantially limited. See HT 62. He further stated that if left untreated his condition

would affect his job performance as it relates to interacting with others and performing and completing required tasks. See, id.

The Complainant noted that he believed Mr. Baker became aware of his condition on October 29, 2013 when he wrote a letter to him requesting a reasonable accommodation. See ROI 62. Additionally, he noted that his wife notified Mr. Baker of a car accident he had in connection with a DUI charge he sustained in September 2013. See, id. He further stated that he believed that Mr. Baker was aware of the police report detailing his DUI charge.

In regards to the Complainant's EEO activity, the Complainant indicated that he was reassigned to the Columbus facility from Florence, SC pursuant to the settlement of an EEO complaint he filed while at the Florence facility. See HT 217. He stated that Barbara Green, Facility Trainer in Florence, SC, informed him that Mr. Baker called the Florence facility to inquire about why the Complainant was being reassigned to Columbus, GA. HT 217-218. The Complainant further indicated that Ms. Green further advised him that Mr. Baker also called Kevin Shannon, Air Traffic Manager in Florence, SC for the same reason. See HT 217.

Subjected to Unfair Training Conditions and Prejudged by Supervisor

The Complainant began working in Columbus, GA in July 2011. At some point, the Complainant's training was put on hold so that they could focus on training Carissa Buchko (Caucasian, female). See HT 103. Mr. Baker has been the manager in Columbus, GA for approximately six years. See HT 96. In that role, he is responsible for managing the tower and ensuring aircrafts move in an out of the airport. See, id. To assist with a trainee's training, an on-the-job-instructor (OJTI) is assigned to a trainee to assist them with learning their job duties and ultimately becoming certified as a controller.

Around March 2013, Ozzie Watson (African-American, male) and Tommy Gould (Caucasian, male) were assigned as the Complainant's OJTIs. On March 1, 2013, at the request of Mr. Baker, a Training Review Board (TRB) was convened to determine whether the Complainant's training should be continued or terminated. As part of this process, the board interviewed Mr. Watson, Mr. Gould and the Complainant. See ROI 131. When asked by the board, Mr. Gould stated that he believed the Complainant

demonstrated the ability to work light, non-complex traffic. He further stated that he believed his poor performance on a recent certification skill check was not indicative of his performance. See, id. Among other items, the Complainant advised the Board that he did not feel as though he was given specific feedback on areas in need of improvement during his training team meetings. See ROI 133. The Board recommended the continuance of the Complainant's training due to training deficiencies identified in their overview of the process. See ROI 135.

The board's recommendation was forwarded to Mr. Lentini for his decision regarding the Complainant's training. On March 6, 2013, Mr. Lentini wrote to the Complainant that he had decided to continue his training based on the imperfections in the training program. See ROI 139. He noted that the deficiencies should have been long since identified. See ROI 139. In his memorandum to the Complainant, he informed him that "I have decided to basically start your training over." See, id.

The Complainant recalled that in July 2013, Chamika Edwards, (African-American, female), a new employee, advised him that Mr. Baker was discussing training with her. See HT 219. During the course of

the conversation, Ms. Edwards informed the Complainant that Mr. Baker told her that he had one person who had already washed out and another person who was still training, but was washing out. See, id. The Complainant noted that at the time of Ms. Edwards' and Mr. Baker's discussion, Mr. Baker was referring to him as being the one still in training and washing out. See, id.

The Complainant stated that Mr. Baker treated him unfairly when it came to his training. He stated that even though he was progressing with his training in July 2013, Mr. Baker kept referring to his performance in June 2013. See ROI 66.

The Complainant had other evidence reflecting that Mr. Baker treated him unfairly when it came to his training. He stated that Mr. Watson informed him that Mr. Baker asked him to change items on the Complainant's training report. See ROI 67. He further stated that Mr. Watson suggested that the Complainant call the Office of Special Counsel (OSC) due to discrimination and mistreatment by Mr. Baker. See, id. The Complainant stated that Mr. Watson did not believe the Complainant was being given a "fair shot." See ROI 68.

As another example, the Complainant

recalled an instance when he trained with Mr. Watson on August 19, 2013. See ROI 63. He recalled that Mr. Watson instructed him to call approach and advise the air carrier that a specific runway was available. See HT 68. The Complainant indicated that after Mr. Baker reviewed the tapes he concluded that another approach should have been taken. See, id. The following day, on August 20, 2013, the Complainant recalled that Mr. Baker called Mr. Watson into his office to discuss the prior day's incident. After their conversation, the Complainant stated that Mr. Watson appeared to be "scared and uneasy" about what was discussed in the office. See ROI 68. The Complainant felt as though Mr. Watson was being pressured into following Mr. Baker's agenda of treating him unfairly. See ROI 68. He commented that he believed this to especially be true when prior to this incident Mr. Watson had advised him that he did not think Mr. Baker was giving him a "fair shot." The Complainant commented that Mr. Baker was a "one man regime" and everyone primarily deferred to him. See ROI 69.

Mr. Gould also believed that Mr. Baker was not treating the Complainant fairly as it came to training. Generally speaking, Mr. Gould commented that training was completely subjective. See HT 262.

He explained there were an infinite number of ways to keep the aircraft separated and get them to the airport, some of which were better than others. See, id. at 263. Mr. Gould commented that a trainer's job was to allow the student to perform his tasks until it became unsafe. At that point, the trainer stepped in to correct the problem.

Mr. Gould recalled an incident in June 2013 when he was providing the Complainant with on-the-job training. See HT 260. He stated that after the session he filled out the June 28, 2013 training form. See HT 262. Mr. Gould recalled that during the training he determined that the Complainant had an aircraft that was getting too close to restricted airspace. As a result, he recalled that he had the Complainant initiate a heading to have the aircraft change his direction of flight. Mr. Gould stated that on the form, he rated the error as a C block error as opposed to an A block error, which is a greater offense than a C block error. Mr. Gould recalled that after he filled out the form, Mr. Baker changed his rating from a C block error to an A1 error. See HT 262. Mr. Gould stated that he did not initial the change or give Mr. Baker his permission to forge his initials on the form. See, id.

When asked if Mr. Gould considered eight sessions of certification skill checks in a little more than a three week period to be out of the norm, he deemed it to be out of the norm and excessive. See HT 264. He classified an average of two sessions within a month to be normal. See, id. Mr. Gould stated that it seemed as though Mr. Baker was shopping for traffic and spending a lot of time looking for busier sessions. See HT 264.

Mr. Gould noted that after the Complainant and Ms. Buchko's training sessions, the number of skill checks to certify was changed. He commented that the change became known by the controllers to be the "Jarvis rules." See HT 268. Mr. Gould explained that those rules meant that controllers could no longer be certified in one or two sessions. Instead, they had to go through multiple check rides. See HT 268. Furthermore, he indicated that after the Complainant's training sessions, they were advised that they no longer had to wait for busier traffic and could certify on low traffic. See HT 265. Specifically, he recalled that the next group of trainees, David Ward, (Caucasian, male) Travis Payne (Caucasian, male) and Chamika Edwards, (African-American, female) were able to certify with

low traffic. See HT 265. Mr. Gould stated that it was his opinion that towards the end of the Complainant's training, the Complainant met the standard that the traffic dictated to be certified. See HT 267.

Mr. Gould recounted another example of the Complainant being treated unfairly. He recalled that despite the fact that a trainee is supposed to be given prior notice of a certification skill check, the Complainant was given one without being giving prior notice. See HT 271. He stated that after the certification skill check, the Complainant believed he was being given an over the shoulder skill check, which is not the same. Mr. Gould noted that the Complainant learned afterwards that it was a certification skill check. See HT 271.

As further evidence of Mr. Baker's mistreatment of the Complainant, Mr. Gould stated that none of the Caucasian male air traffic controllers have had their training suspended or have had to go to the TRB. See HT 269. He commented that prior to the Complainant's training, all the females and African-American males had to do so except for Brandon Richardson (African-American, male). He commented that Mr. Richardson came from the Atlanta bridge control, the highest level facility, and was

EEOC Decision                    Mosley v. DOT, et al.                    July 30, 2015

therefore, under a different circumstance than the others. Mr. Gould further stated that Don Mills, (African-American, male) certified without having his training being suspended, however, he certified under Tom Fourney, the previous manager. He indicated that both he and Mr. Mills started on the same day so he was at the facility when Mr. Mills certified. See HT 287. Mr. Gould further stated that it was his understanding that Antonio Grandison (African-American, male) went to the TRB. See, id. Mr. Gould further noted that he did not know whether Irwin Jackson (African-American, male) had to go to a TRB. See, id. He further stated that in addition to Ms. Buchko, there was also another Caucasian, female named Ashley whose last name he could not recall that had her training suspended and ultimately terminated.

In regards to the mistreatment of the Complainant, Mr. Gould indicated that he advised Tom Boland, that it appeared that there was a difference in the way skill checks were being administered to Ms. Buchko and the Complainant. See HT 292. Mr. Gould stated that he advised Mr. Boland that as opposed to watching the Complainant's performance Mr. Baker appeared to be shopping for errors based on the amount of check rides. See, id. As a result of his

discussions about how the Complainant and Ms. Buchko were being treated, Mr. Gould indicated that Mr. Baker retaliated against him.

Finally, Mr. Gould stated that at one point he was somewhat of Mr. Baker's confidant. See HT 293. He stated that Mr. Baker tried to get him to recommend that the Complainant go to a TRB. See, id. He indicated that he refused to do so. He further stated that he informed Mr. Baker that he would not support him if the recommendation was made and would instead speak on behalf of the Complainant. See HT 293. He further stated that he had a bias against the Complainant and Ms. Edwards from the beginning. See HT 295. He recalled that Mr. Baker pulled him aside and showed him Ms. Edwards' "pumpkin" which was what they called an employee's personnel folder. See HT 294. Mr. Gould indicated that Mr. Baker pointed out items in her folder he believed demonstrated difficulties she had during her training including an absence from her training due to a pregnancy. See HT 295.

Likewise, Mr. Gould recalled Mr. Baker discussed the Complainant's background information. See HT 295. He commented that Mr. Baker showed him an arrest record for the Complainant and also other

items that had occurred in Florence, SC. See, id. Mr. Gould further stated that Mr. Baker informed him that he had a discussion regarding the Complainant with the management at the Florence facility. See HT 295.

According to Mr. Baker, he did not discriminate against the Complainant. He commented that he learned that the Complainant was diagnosed with alcohol dependence and depression on October 29, 2013 when he requested a reasonable accommodation. See HT 81. Mr. Baker also stated that he learned of his EEO activity sometime in August 2013. Additionally, Mr. Baker stated that sometime in 2013, he learned from Mr. Gould that Mr. Watson was encouraging the Complainant to file an OSC complaint against him. See HT 77. He denied contacting the Florence facility to inquire about the Complainant. See HT 13.

Mr. Baker further stated that instead of considering the Complainant's training as a restart, he considered it to be a continuation of training. See HT 15, 24. Mr. Baker confirmed that he considered the Complainant's past performance when he was continuing his training. See HT 46. He explained that the facility had trained him for almost two years. See, id. He stated that after they corrected all the

mistakes noted by the TRB, they gave the Complainant one last opportunity to succeed. In total, the Complainant was trained over 540 hours of training.

In regards to the training report form being changed in June 2013, Mr. Baker recalled that Mr. Gould observed the Complainant and initially wrote an observation on the training report form. See HT 27. Mr. Baker further stated that Mr. Gould changed his initial observation of the Complainant. See ROI 28. At the direction of Mr. Gould, Mr. Baker stated that he changed the training report form. See HT 29. Mr. Baker claimed that Mr. Gould instructed him to put Mr. Gould's initials on the form. See, id. As to why he did not write an addendum to the report, Mr. Baker stated that he had been previously instructed to not write addendums to training reports when he determined an instructor was not accurately recording performance. See HT 32.

Mr. Baker confirmed that a trainee was required to be notified before each certification skill check. See HT 54. Mr. Baker recalled that the Complainant had eight certification skill checks in August 2013. See HT 50. He commented that on three of those days the Complainant had two sessions in one day. See, id. Mr. Baker noted that he recalled

informing the Complainant in June 2013 that he did a good job after a few of his sessions. See ROI 79. Mr. Baker admitted to certifying controllers on low traffic volume after the Complainant's training was terminated. See HT 52. According to Mr. Baker, after the Complainant's training was terminated the traffic volume in Columbus declined. See, id. He stated that after the Complainant's training was terminated, he certified Mr. Ward, Mr. Payne and Ms. Edwards with lower traffic volume. See HT 54.

On July 8, 2013, Mr. Baker issued the Complainant a notice of unacceptable performance. See ROI 145. The memorandum listed examples from June 4, 2013 through June 30, 2013, that did not meet expectations. See, id. The memo reflected that the continued failure to meet expectations would lead to the termination of his training. See, id.

Mr. Baker commented that on August 22, 2013, Cherie Hilt also observed the Complainant's training. See HT 57. Mr. Baker confirmed that he emailed some comments to her after she sent in her observations of the Complainant's training. See HT 59. In his email to Ms. Hilt, he asked her to delete the attachment he provided her as part of his comments after she reviewed it. See HT 57.

Mr. Baker further reqalled that the Complainant was incarcerated for a DUI sometime during the month of September 2013. See HT 69. He recalled that he learned he was in jail because the Complainant attempted to call the facility collect from jail to request sick leave. Mr. Baker noted that the call was not accepted. See, id. After learning that the Complainant was in jail, Mr. Baker stated that he called the jail to determine whether he was in fact incarcerated there. He stated that at some point he received a copy of the police report. See HT 69. He was unsure who sent it to him, but he believed Mr. Lentini sent it to him. See, id.

Mr. Lentini recalled an instance where Mr. Baker advised him that the Complainant had been incarcerated. See HT 167. He stated that as a result of the information, he obtained a copy of the police report to confirm that the Complainant had in fact been incarcerated and to determine the reason for the incarceration. See HT 168. After receiving a copy of the police report, Mr. Lentini stated that he believed he emailed a copy to Mr. Baker. He stated that he did not provide a copy to the TRB. See HT 169. He stated that it would have been improper for them to consider any off duty activity in their

.determination about the Complainant's training. See, id.

Suspension and Termination of Training

On August 26, 2013, Mr. Baker advised the Complainant that his training was being suspended. See ROI 69. At Mr. Baker's request, a TRB was convened on September 10, 2013 to determine whether the Complainant's training should continue or be terminated. As part of this process, Mr. Mills was interviewed. Mr. Mills stated that the Complainant showed vast improvement. See HT 160. He further stated his training team was well aware of his improvement.

Mr. Mills further stated that he voiced his concerns during training team meetings with Mr. Baker's reluctance to provide clear instruction on which specific deficiencies had to be corrected for the Complainant to be considered for certification. See ROI 161. Mr. Mills stated that since Mr. Baker did not provide them with specific instructions he provided the Complainant guidance on what he felt needed to be addressed. Mr. Mills further commented that he believed that the Complainant could fix the specific issues if he was advised of the specific

issues. See, id....

Further, Mr. Mills commented that Mr. Baker's issuance of the letter of unacceptable performance "came out of nowhere." See ROI 161. He stated that he felt it was issued due to Mr. Baker's inability to let a problem go. He noted that the letter cited issues identified in the earlier stages of the Complainant's training that went back to June 4, 2013. See, id. He additionally stated that he believed the Complainant should have been certified after the first certification skill check on August 2, 2013. See ROI 162.

On September 27, 2013, the TRB wrote a Memorandum to Mr. Lentini. See ROI 152. In the Memorandum, they recommended the Complainant's training be terminated. See ROI 170. In the memorandum, it was noted that the Complainant was unable to be interviewed as scheduled on September 10, 2013, due to the fact he was incarcerated. The note further revealed that a copy of the police report was attached to the memorandum. See, id. The Complainant's interview was rescheduled for September 18, 2013.

On the same date, Mr. Lentini issued the Complainant a Memorandum proposing to terminate his

training. Thereafter, on November 4, 2013, Mr. Lentini issued a Decision regarding Proposed Termination of Training. See ROI 321. In the memo, he terminated the Complainant's training. See, id. He further instructed the Complainant to continue reporting to Columbus ACTC.

Mr. Baker stated that for the six years he had been a manager at the Columbus, GA facility, he had not suspended any Caucasian males' training and that none of them had been sent before a TRB. See HT 33. Prior to the Complainant's training, Mr. Baker further listed the African-American employees whose training he did not suspend. More specifically, he stated that he did not suspend Mr. Mills', Mr. Richardson's, Mr. Grandison's or Mr. Jackson's (African-American, male) training or send them before a TRB. See HT 114-115.

Likewise, in this time period, Mr. Baker listed the employees whose training he did suspend. More specifically, he stated that in addition to the Complainant, he suspended Scott Woodley's (African-American, male), Dexter Rose's (African-American, male), Chris Smith's (African-American, male) and Carrisa Buchko's (Caucasian, female) training. See HT 119. Out of

those individuals, Mr. Baker noted that Mr. Woodley and Mr. Rose were certified, however, Mr. Smith's, and Ms. Buchko's training was terminated. See HT 119. Mr. Baker confirmed that whether a trainee's training was suspended or not was up to him. See HT 44.

According to Mr. Lentini, he did not discriminate against the Complainant. He commented that he learned that the Complainant engaged in EEO activity sometime after the Complainant contacted an EEO counselor. See HT 199. He further stated that he learned of his medical condition after the Complainant requested a reasonable accommodation.

In regards to whether the Complainant's training should be terminated or not, Mr. Lentini commented that the Complainant was given many opportunities to certify and he was unable to complete the training successfully. See ROI 92. Mr. Lentini commented that the Complainant did not demonstrate the ability to work the traffic on his own. See, id. Mr. Lentini stated that after receiving the TRBs recommendation to terminate the Complainant's training, he considered the past information he had received, thought about it a couple of days and made the decision to terminate the training. See HT 195. Mr. Lentini stated that he

never personally reviewed any of the Complainant's certification skill checks. See HT 190. He stated that he reviewed the training report forms of the certification skill checks and spoke to Mr. Baker about his progress. See, id. Mr. Lentini recalled one training session that he reviewed of the Complainant's after Mr. Mills indicated that the Complainant could have been certified from that session. See HT 191.

A review of a document submitted as part of the ROI reflects the employees who had their training suspended/terminated in 2013 or 2014. See ROI 91. In addition to listing the Complainant and Ms. Buchko, it also lists Travis Payne as being an employee whose training was suspended/terminated. See, id.

A review of various documents submitted as part of the ROI reflects conflicting information. One document reflects that in 2012-2013, out of the individuals who worked under Mr. Baker only the Complainant and Ms. Buchko had EEO activity. See ROI 281. On this document, they are both listed as being the only employees with their training suspended/terminated. See, id. Another document reflects that out of the individuals who worked under Mr. Baker in 2012-2013, the Complainant, Ms. Buchko

and Mr. Grandison had EEO activity. See ROI 279. According to this document, part of these three employees' EEO complaints listed training as one of their issues. See, id.

### Reasonable Accommodation Request

After receiving the proposed termination of his training on September 27, 2013, the Complainant sent a request for reasonable accommodation to Mr. Baker, which was received on October 29, 2013. See ROI 177. The letter stated Complainant suffered from alcohol dependence for which he was currently under treatment. See, id. It further stated he was making a reasonable accommodation request, seeking a last chance agreement, and at the successful end of said agreement the status of his training should be recycled. See, id. Mr. Baker responded to the request on November 4, 2013, which was also the same day that Mr. Lentini decided to place the Complainant on paid administrative leave. See ROI 92.

In regards to the administrative duties, according to the Complainant he reported to the Columbus facility to perform administrative duties. Complainant testified that he reported to work on or around November 4, 2013, because Mr. Baker assigned

him non-air traffic control/administrative duties. See HT 222. Complainant also stated that sometime that day, Mr. Baker informed him not to return to do administrative work. See, id.

Mr. Baker testified that he sent the Complainant an email to come in and perform administrative duties that day, but the Complainant never showed up. See HT 89. Complainant's attorney sent a letter to Mr. Lentini on November 4, 2013 affirming that Complainant went to work to complete administrative work, and would like to continue to do so in light of his recent accommodation request. See ROI 182.

On November 4, 2013, Mr. Lentini made the decision to place the Complainant on paid administrative leave. See ROI 92. He stated that he placed the Complainant on paid administrative leave because Mr. Baker reported there were not sufficient administrative duties for the Complainant to perform and he was not medically cleared perform ATC duties. Further, Mr. Lentini noted that the Complainant was most likely going to be issued a proposed removal following his arrest. See, id.

Also, on November 4, 2013, the Complainant received a response to his reasonable accommodation

request. Mr. Baker acknowledged receipt of the initial accommodation request on October 29, 2013 and requested additional information from the Complainant. See ROI 179. In the letter responding to the request, Mr. Baker wrote additional questions that needed to be answered by the Complainant's physician and gave a ten day deadline to provide the requested information. See, id.

On November 20, 2013, the Agency received a letter from the Complainant's doctor, Sandra Thomas, MD. ROI 193. Dr. Thomas stated why the Complainant was previously unable to work and that he had been diagnosed with alcohol dependence and depression. See, id. She went on to say that "his prognosis is good and he is expected to improve as long as he maintains his sobriety and stays in treatment. The duration of the impairments is 1-2 months." See ROI 193. This letter did not directly respond to all of the questions asked by Mr. Baker in his November 4, 2013 letter to the Complainant. See ROI 179. Mr. Baker did not have any more correspondence with the Complainant regarding the accommodation request until December 17, 2013.

On December 17, 2013, Mr. Baker issued a letter denying Complainant's reasonable accommodation

request. See ROI 190. The request was denied because the required medical documentation was not provided by the initial deadline given. The letter further states "because you have been denied for lack of medical records, you may at any time reinitiate the reasonable accommodation process request." See, id. The Complainant was then issued a 30 day proposal of termination from federal service on January 3, 2014. See ROI 273.

Complainant's attorney responded with additional medical documentation and a more detailed letter on February 7, 2014[2] requesting a reconsideration of his denial of a reasonable accommodation. See ROI 254. Dr. Thomas wrote about the specific accommodations that should be taken in order to help the Complainant with his depression and alcoholism. See ROI 195. The letter goes into more detail than the previous letter and states how Complainant's disabilities can affect his job performance. See, id. Mr. Baker responded to this letter on March 20, 2014 with his final denial of the Complainant's request. See Agency Exhibit 9. Mr. Baker explained that the Complainant's request would ultimately be denied because it came after a long history of unsatisfactory training performance and

that these requests are prospective in nature. See Agency Exhibit 9.

According to Mr. Baker, he received input from Mr. Lentini and Labor Relations about the request but, as Complainant's supervisor, he was the one responsible for making the decision. See HT 178, 179. At the hearing Mr. Baker, stated an additional reason he denied the request. He testified that he denied the request because the Complainant had already been issued a notice of proposal to terminate and there would be no future employment, therefore he denied the request. See HT 85, 86. Mr. Baker stated the Complainant could have worked as an air traffic assistant however there were no open positions available at the Columbus facility. See HT 132. Mr. Baker asserted that he did not check to see if there was a position available at another facility. HT 133. The Complainant was terminated from federal service on April 4, 2014 due to his failure to demonstrate the ability to work in a less complex facility. See HT 175.

Dr. John Barson stated that by the Complainant being on Zoloft he would be considered restricted medically and could not perform aviation safety-related duties while on that medication. See

HT 305. He explained that the medication could affect a controller's attention, thought process and general interaction with others. See HT 306. Dr. Barson further noted that there have been controllers that have been treated for depression and returned to work after their condition was resolved. See HT 307.

VII  APPLICABLE LAW AND ANALYSIS

Disparate Treatment Claim

The Title VII of the Civil Rights Act of 1964, as amended, prohibits discrimination based on race, sex, color, religion, or national origin with respect to the terms, conditions, or privileges of an individual's employment. 42 U.S.C. § 2000e-16, et seq. To prevail in a disparate treatment claim such as this, the Complainant must show that the employer intentionally discriminated against him when it made the employment decisions that form the basis of the complaint. Int'l Bhd. of Teamsters v. United States, 431 U.S. 324 (1977). A Complainant may prove his case through either direct or indirect evidence.

In the absence of direct evidence of discrimination, a claim alleging disparate treatment is examined under the three-part test set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792

(1973). Under this analysis, a Complainant must initially establish a prima facie case of discrimination by presenting facts that, if unexplained, reasonably give rise to an inference of discrimination. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993); Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).

Title VII prohibits discrimination not just because of one protected trait (e.g., race), but also because of the intersection of two or more protected bases (e.g., race and sex)." EEOC Compliance Manual, Section 15, "Race and Color Discrimination," No. 915.003, at 15-4 (April 19, 2006). Here, I find that the Complainant is claiming that he was subjected to discrimination because of the intersection of his race and color which is covered under Title VII.

To establish a prima facie case of discrimination based on race and sex, the Complainant must show that: 1) he is a member of a protected class; 2) he was subjected to an adverse employment action; and 3) he was treated differently or less favorably than persons otherwise similarly-situated who are not members of the protected class. McDonald v. Sante Fe Train Transportation Co., 427 US 273 (1976).

It is well established that in order for two or more employees to be considered similarly situated, all relevant aspects of the employees' work situation must be identical or nearly identical, i.e., the employees report to the same supervisor, perform the same job function, and work during the same time periods. Sibley v. USPS, EEOC Request No. 0520070076 (February 6, 2007)(citing Anderson v. Department of Treasury, EEOC Appeal No. 01A22092 (March 13, 2003).

To establish a prima facie case of reprisal, the Complainant must show that: (1) he engaged in protected activity; (2) the Agency was aware of his protected activity; (3) subsequently, he was subjected to adverse treatment by the Agency; and (4) a nexus exists between the protected activity and the adverse action.  Carr v. United States Postal Serv., EEOC App. No. 0120065298 (Jun. 26, 2007); O'Neal v. Ferguson Const. Co., 237 F.3d 1248, 1252 (10th Cir. 2001); Hoschstadt v. Worcester Foundation for Experimental Biology, 425 F. Supp. 318, 324 (D. Mass.), aff'd, 545 F.2d 222 (1st Cir. 1976).

The Supreme Court has stated that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse,"

which means that the action might have "dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington Northern & Santa Fe Ry. Co. v. White, 126 S. Ct. 2405, 2515 (2006). This is consistent with Commission policy, which states that acts of retaliation do not need to be significant employment actions in order to be actionable and that any act likely to deter protected activity is unlawful. See EEOC Compliance Manual, Section 8, "Retaliation" at p. 8-14 (1998); Stup v. United States Postal Serv., EEOC App. No. 05990465 (Apr. 11, 2000).

Title VII prohibits employers from "discriminat[ing] against any of [its] employees...because [such employees have] opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge...or participated in any manner in an investigation, proceeding or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). With regard to reprisal discrimination, the Commission has stated that "[t]he anti-reprisal provision of Title VII protects those who participate in the EEO process and also those who oppose discriminatory employment practices. Participation occurs when an employee has made a

charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing. Whipple v. Dep't of Veterans Affairs, EEOC Request No. 05910784 (Feb. 21, 1992).

The burden then shifts to the Agency to articulate a legitimate, nondiscriminatory reason for the challenged actions. Burdine, 450 U.S. at 253-54; McDonnell Douglas, 411 U.S. at 802. The Agency's burden here is not an onerous one. The Agency must give an explanation that is "legally sufficient" to justify a judgment for the employer. See, id. at 255. The Commission has interpreted this term to mean that the "explanation is set forth with sufficient clarity as to allow the employee a full and fair opportunity to demonstrate pretext." Parker v. United States Postal Serv., EEOC Request No. 05900110 (Apr. 30, 1990).

Ultimately, the Complainant must prove, by a preponderance of the evidence, that the Agency's articulated reason for its action was pretext for unlawful discrimination. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000); Hicks, 509 U.S. at 511; Burdine 450 U.S. at 252-253; McDonnell Douglas, 411 U.S. at 804.

Disability Discrimination

The Rehabilitation Act of 1973 (Rehabilitation Act) prohibits discrimination against individuals with physical or mental disabilities. 29 C.F.R. §1614.203. As a threshold matter, one bringing a claim of disability discrimination must first establish that he is a member of the class of persons protected by the Rehabilitation Act.

EEOC Regulations 29 C. F. R. Section 1630.2 (g) defines a disability as:  (1) a physical or mental impairment which substantially limits one or more major life activities; (2) a record of such an impairment; or (3) being regarded as having such an impairment.  In determining whether the Complainant is substantially limited in a major life activity, several factors are relevant: (i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact of or the expected permanent or long term impact of or resulting from the impairment.  29 C.F.R. Section 1630.2 (j)(2); John W. Davis v. United States Postal Service, EEOC Appeal No. 01944224 (June 30, 1995), citing  Roy H. Wright v. United States Postal Service, EEOC Request No. 05940060 (May 31, 1994).  The term "major life

activities" refers to such functions as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2 (i).

Complainant must also demonstrate that he is a "qualified individual with a disability" which is one who meets the education and/or experience requirements for the position and can perform the essential functions of the position with, with or without reasonable accommodation. 29 C.F.R Section 1630.2 (m). The term "essential function" does not include the marginal functions of the position. In determining whether a function is essential, the regulations state that there are several factors to consider, including whether the position exists to perform that function.

Of note, the Commission's regulations require an Agency to make reasonable accommodation for the known physical and mental limitations of a qualified individual with a disability unless it can s how that accommodation would cause an undue hardship. 29 CFR Section 1630.2(o), 1630.2(p).

1.  Unfair Training Conditions and
    Prejudged by Supervisor
    Again, based on the Complainant's

complaint, the undersigned notes that it appears that the Complainant is claiming that he was subjected to discrimination based on his status as an African-American, male. In regards to this issue, the undersigned finds that the Complainant has established a prima facie case of race and sex discrimination. He is a member of a protected class based on his race and sex. He was subjected to an adverse employment action when he was subjected to unfair training conditions and prejudged by his supervisor. Additionally, he was treated less favorably than similarly-situated individuals outside of his protected class. The evidence reveals that Caucasian, males were not subjected to the same type of treatment as the Complainant. For instance, the evidence fails to show that Caucasian, males were subjected to the same training conditions or treated in the same manner to which the Complainant had been treated as it relates to his training.

As it relates to retaliation, the undersigned finds that the Complainant has established a prima facie case of retaliation. The Complainant engaged in prior and current EEO activity. I find that Mr. Baker was aware of the prior EEO activity. As a result of his prior EEO

activity, the Complainant was transferred from the Florence facility to the Columbus facility due the settlement of an EEO complaint. Since he was placed at the facility without being formally selected to work there, I find that management was aware of his prior EEO activity. Moreover, the evidence reflects that Mr. Baker called his former facility to find out information about the Complainant. Subsequently, he was subjected to adverse treatment. Finally, I find there is a nexus between the protected activity and the adverse treatment.

The Agency articulated a legitimate, non-discriminatory reason for their actions. Mr. Baker denied treating the Complainant unfairly during his training. He recalled that on two occasions after the training sessions in July 2013, he told the Complainant he did a good job. In regards to changing the training report form in June 2013, Mr. Baker stated that Mr. Gould instructed him to change the form. He further stated that the Complainant was provided with eight sessions of certification skill checks in August 2013 to give him every opportunity to succeed. As to why trainees were able to certify with a low traffic volume after the termination of the Complainant's training, he stated that by that

time the traffic volume in Columbus had declined.

The undersigned finds that the Complainant proved that the Agency's articulated reasons for their actions were a pretext to illegal discrimination. First and foremost, the undersigned did not find Mr. Baker to be a credible witness. For some answers, he gave inconsistent statements during his testimony. For other potions of his testimony, the undersigned finds he was unworthy of belief. For instance, he claimed that he was instructed by Mr. Gould to change the Complainant's training report form. However, Mr. Gould denied this fact. Additionally, despite the fact that two witnesses testified otherwise, Mr. Baker claimed that he did not call the Florence facility to inquire about the Complainant.

From the evidence presented, it appears that no matter how many hours of training the Complainant was provided, Mr. Baker was going to do all he could to not certify the Complainant. Mr. Gould noted that at one point he was Mr. Baker's confidant. He indicated that after listening to Mr. Baker discuss the Complainant he believed Mr. Baker had it in for the Complainant from day one. Along these lines, it appears that even though Mr. Lentini

wrote in a memorandum to the Complainant that his training was going to start over, Mr. Baker did not consider his training as starting over. Instead, Mr. Baker admitted that he considered the Complainant's past performance when assessing his training and considered the training to be a continuation of the training.

Interestingly, after the Complainant's training, there was a change in the way the trainees were certified. Apparently, the very next group was able to certify with low traffic. After the Complainant's training was terminated, the controllers came up with the term the "Jarvis rules" which is a term the controllers came up with to describe the new requirements put into place. According to these requirements, trainees had to be given multiple check rides to be able to certify. Prior to the Complainant's training, trainees were able to certify on just a few check rides.

Moreover, Mr. Gould indicated that he observed a difference in how Mr. Baker was training the Complainant. According to Mr. Gould, it appeared that during the training sessions, Mr. Baker was giving the Complainant multiple checks to shop for errors instead of looking for progress. Mr. Gould

stated that he complained to management about this difference and was shortly thereafter, retaliated against by Mr. Baker for doing so.

      2.  Suspension and Termination of the Complainant's Training

Additionally, the undersigned finds that the Complainant has established a prima facie case of race and sex discrimination. He is a member of a protected class based on his race and sex. He was subjected to an adverse employment action when his training was suspended and ultimately terminated. He was treated less favorably than similarly-situated individuals not in his protected class. According to Mr. Baker, while he had been employed as manager at the Columbus facility, he had not suspended any Caucasian, males' training or referred them to a TRB. However, in this time period, he suspended the training of four African-American males' training, Mr. Woodley, Mr. Rose, Mr. Smith and the Complainant and referred them to a TRB. Two of these individuals ultimately were certified and two were not.

As previously stated, the undersigned finds that the Complainant has established a prima facie case of reprisal. The Complainant engaged in prior and current EEO activity. I find that management was

aware of the Complainant's EEO activity. Again, as a result of his prior EEO activity, the Complainant was transferred from the Florence facility to the Columbus facility due to a settlement agreement. The mere fact that he was allowed to transfer meant that more likely than not those at the facility were aware of the circumstances of his reassignment. Subsequently, he was subjected to adverse treatment. I find there is a nexus between the protected activity and the adverse treatment.

As previously noted, the Complainant engaged in prior and current EEO activity. As a result of his prior EEO activity, the Complainant was transferred from the Florence, SC facility due to a settlement agreement. The undersigned finds management was aware of the EEO activity. As previously noted, the undersigned further finds there is a nexus between the protected activity and the adverse action.

The Agency articulated a legitimate non-discriminatory reason for suspending and ultimately terminating his training. Mr. Baker stated that he suspended the Complainant's training because he used all of his allotted hours to train and was unable to certify. He commented that as a result he

was required to suspend the training and request a TRB. Thereafter, Mr. Baker stated that the TRB recommended terminating the Complainant's training and forwarded their recommendation to Mr. Lentini.

According to Mr. Lentini, in order to make a decision regarding terminating the Complainant's training he thought about it for a few days, reviewed what documents he had, and decided to terminate the training. Mr. Lentini stated that he never personally reviewed any of the Complainant's certification skill checks. He stated that he reviewed the training report forms and spoke to Mr. Baker about his progress.

The undersigned finds that the Complainant proved that the Agency's articulated reasons were pretextual. Once again, the undersigned did not find Mr. Baker to be a credible witness. The evidence revealed that Mr. Baker basically ran the facility and that the trainers mainly deferred to his judgment. At times if they did not, he overrode them and signed their initials without their permission, as was apparently the case with Mr. Gould's completion of the June 28, 2013 training report form.

Further, Mr. Baker admitted to not suspending any Caucasian males' training in the six

years he had been manager, but to suspending four African-American males' training. While Mr. Baker further indicated that he had not suspended the training of four African-American males' training, Mr. Mills, Mr. Richardson, Mr. Grandison and Mr. Jackson, the undersigned notes that even if this is true, this fact alone does not preclude the Complainant from establishing a prima facie case of discrimination. Mashburn v. USPS, EEOC Appeal No 01832462 (September 18, 1985); see also EEOC Compliance Manual, Section 15: "Race and Color Discrimination," No. 915.003, at 15-5 (April 19, 2006), p. 9.

Moreover, Mr. Baker's statement of not suspending four African-American males' training requires a closer review. Upon this review, according to Mr. Gould who started on the same day as Mr. Mills, Mr. Mills certified under Mr. Fourney and not Mr. Baker. Additionally, Mr. Richardson was in a different situation entirely because he was certified in Atlanta which is a level 12 facility, whereas Columbus is a level 4 facility. As it relates to Mr. Grandison, Mr. Gould believed that his training was in fact suspended. A review of a document provided in the ROI reflects that Mr. Grandison had filed an EEO

complaint which included training as an issue. This fact lends credence to Mr. Gould's belief that Mr. Grandison's training was in fact suspended. As it relates to Mr. Jackson, the evidence is unclear as to whether Mr. Baker ever suspended his training or not.

Mr. Gould further complained to higher management indicating that the Complainant seemed to be held to a higher standard. He stated that it appeared Mr. Baker was shopping for errors instead of attempting to certify the Complainant.

Further, Mr. Watson advised the Complainant that he should complain to the OSC because he believed the Complainant was not being given a "fair shot" and was being discriminated against by Mr. Baker. Even though Mr. Watson wasn't forthright when asked by the TRB of his thoughts on the Complainant's training, both Mr. Gould and the Complainant referenced some items that Mr. Watson advised them with which he disagreed regarding the Complainant's training. Additionally, the Complainant stated that he believed Mr. Watson got scared when Mr. Baker spoke to him about a particular training incident and felt pressured to conform to Mr. Baker's agenda regarding the Complainant's training.

Additionally, Mr. Mills advised the TRB

that he disagreed with Mr. Baker's issuance of the letter of performance. He stated that he believed the Complainant should have certified on August 2, 2013. Mr. Mills further stated that when he asked for guidance in regards to training the Complainant, Mr. Baker provided none. Very telling, Mr. Mills stated that he believed that the Complainant could fix any specific issues he had if he was notified of exactly what the issues were. Likewise, Mr. Gould stated that he believed the Complainant should have been certified with the lower volume traffic of the facility.

The Commission has recognized the viability of the cat's paw theory to prove discriminatory animus by imputing the discriminatory attitudes of influential peers to the formal decision-maker. See, Gustavo Reveles, EEOC Appeal No.0120110759 (June 20, 2012). To do so, a Complainant must demonstrate that individuals harboring discriminatory animus had influence or leverage over the official decision-maker. See, id. The undersigned finds that Mr. Baker had influence over Mr. Lentini based on his position as manager. According to the Complainant and other evidence of record, Mr. Baker was a "one man regime" at the facility and everyone primarily

deferred to him. Mr. Baker confirmed that he was the one to determine whether a trainee's training got suspended and they went before the TRB. Therefore, the termination of a trainee's training began with him.

In regards to the termination of the Complainant's training, Mr. Lentini stated that after he received the recommendation from the TRB, he reviewed the information he had and took a few days to determine whether to terminate the training. However, the evidence reveals that Mr. Lentini issued the memorandum terminating the Complainant's training on September 27, 2013, the exact same day the TRB made their recommendation to Mr. Lentini. Thus, it appears Mr. Lentini already had his mind made up that he was going to terminate the Complainant's training. Very telling, in making his determination, Mr. Lentini stated that, as is usual, he partially relied on Mr. Baker's review of how the Complainant was progressing through training. He further commented that he did not personally observe any certification skill checks, but he had reviewed some of the training reports. The undersigned finds that Mr. Baker had an influence over Mr. Lentini's decision to terminate the Complainant in that Mr.

Baker was the one making all the decisions as it related to whether or not a trainee's training should be suspended and the evidence reflected that Mr. Baker was in a position to manipulate either a training instructor or the actual training report.

Of note, although completely unrelated to the termination of the training, an unknown individual referenced the Complainant's incarceration on the front page of TRB's recommendation to terminate the Complainant's training. The note further reflected that the actual police report was attached to the recommendation. The undersigned finds that making such a reference and attaching the police report served to discredit the Complainant.

Finally, the undersigned notes that documents provided in the ROI reflected inconsistent information. One document reflected only the Complainant and Ms. Buchko had EEO activity, while another one indicated that the Complainant, Ms. Buchko and Mr. Grandison had EEO activity. Another document reflected that Travis Payne's training was suspended and ultimately terminated although none of the other evidence reflected this fact. Hence, the undersigned is uncertain of the accuracy of the documents as a whole.

In sum, adding up all of these facts more convincingly point to the fact that the Complainant was discriminated against and retaliated against as it relates to him being subjected to unfair training conditions, prejudged by his supervisor as well as having his training suspended and terminated.

3.    Training was Terminated after Requesting an Accommodation and the Complainant was not Assigned Administrative Duties

As part of the Complainant's claim, he has alleged that the Agency failed to reasonable accommodate him after he disclosed to them that he had a disability. For the purpose of this decision, I will find that the Complainant is a qualified individual with a disability within the meaning of the Rehabilitation Act. However, the evidence reveals that the Complainant did not notify the Agency of his disability until after he was issued a proposed termination of his training. Prior to this disclosure the agency had no notice that the Complainant had any type of disability. By the time they were notified the Agency was already in the process of terminating the Complainant's training. Since reasonable accommodation is always prospective, an employer is

not required to excuse past behavior even if it is the result of the individual's disability. Guidance at Question 36; See also Trujillo v. USPS, EEOC No. 01A24065 (June 12, 2003). Without notice of the Complainant's medical condition, the Agency was not required to provide a reasonable accommodation of the Complainant's condition.

In regards to the Complainant being discriminated against based on his race and sex, the undersigned finds that the Complainant failed to establish a prima facie case of discrimination on this issue. The Complainant is a member of a protected class based on his race and sex. Additionally, he was subjected to an adverse employment action when he was not assigned administrative duties.[3]  The Complainant has failed to provide evidence that he was treated less favorably than similarly-situated individuals not in his protected class. Here, the Complainant has not provided any evidence of who was treated better than him in connection with this issue. He has further not provided any other evidence to raise an inference of discrimination based on his race and sex as it relates to not being assigned administrative duties.

In regards to the Complainant being

discriminated against based on his EEO activity, the undersigned finds that the Complainant established a prima facie case of discrimination on this basis. The Complainant engaged in protected activity. The Agency was aware of the activity. In fact, by this time, the undersigned finds they were aware of his prior and current EEO activity. A nexus exists between the protected activity and the adverse action.

The Agency has articulated a legitimate, non-discriminatory reason for their action. Mr. Lentini stated that he placed the Complainant on paid administrative leave instead of having the Complainant report to work, because there were insufficient administrative duties for the Complainant to perform. He further noted that the Complainant was not medically cleared to perform his air traffic controller-related duties so he was unable to perform those duties.

The undersigned further finds that the Complainant failed to prove that the Agency's reasons were pretextual. For instance, the evidence fails to show that there were sufficient administrative duties available for him to perform. Or, that the Agency gave a similarly-situated individual outside of the Complainant's protected class administrative duties

during this same time period instead of him. For the foregoing reasons, I find that the Complainant failed to provide evidence that would give rise to an inference of discrimination based on his race, sex or EEO activity as it relates to this issue.

### VIII. CONCLUSIONS OF LAW

1) The Complainant established a prima facie case of discrimination in regards to the first and second issues.

2) The Agency articulated a legitimate non-discriminatory reason for its actions.

3) The Complainant proved that the Agency's reasons were pretextual on the first and second issues, but not the third and fourth issues.

### IX DECISION

I find that the Agency discriminated against the Complainant based on his race, sex and EEO activity in connection with his first and second issues, but not his third and fourth issues.

## X. NOTICE TO THE PARTIES

TO THE AGENCY:

Within forty (40) days of receiving this decision and the hearing record, you are required to issue a final order notifying Complainant whether or not you will fully implement this decision. You should also send a copy of your final order to the Administrative Judge.

Your final order must contain a notice of Complainant's right to appeal to the Office of Federal Operations, the right to file a civil action in a federal district court, the name of the proper defendant in any such lawsuit, the right to request the appointment of counsel and waiver of court costs or fees, and the applicable time limits for such appeal or lawsuit. A copy of EECO Form 573 (Notice of Appeal/Petition) must be attached to your final order.

If your final order does not fully implement this decision, you must simultaneously file an appeal with the Office of Federal Operations in accordance with 29 C.F.R. § 1614.403, and append a copy of your appeal to your final order. See EEOC Management Directive 110, November 9, 1999, Appendix O. You must also comply with the Interim Relief

regulation set forth at 29 C.F.R. § 1614.505.

TO THE COMPLAINANT:

You may file an appeal with the Commission's Office of Federal Operations when you receive a final order from the Agency informing you whether the Agency will or will not fully implement this decision, 20 C.F.R. § 1614.110(a). From the time you receive the Agency's final order; you will have thirty (30) days to file an appeal. If the Agency fails to issue a final order, you have the right to file your own appeal any time after the conclusion of the Agency's forty (40) day period for issuing a final order. See EEO Management Directive 110, Chapter 9-3. In either case, please attach a copy of this decision to your appeal.

Do not send your appeal to the Administrative Judge. Your appeal must be filed with the Office of Federal Operations at the address set forth below, and you must send a copy of your appeal to the Agency at the same time that you file it with the Office of Federal Operations. In or attached to your appeal to the Office of Federal Operations, you must certify the date and method by which you sent a copy of your appeal to the Agency.

WHERE TO FILE AN APPEAL:

All appeals to the Commission must be filed by mail, hand delivery or facsimile.

BY MAIL:

Director, Office of Federal Operations

Equal Employment Opportunity Commission

P.O. Box 77960

Washington, D.C. 20013

BY PERSONAL DELIVERY:

Director, Office of Federal Operations

Equal Employment Opportunity Commission

131 M Street, NE, Suite 5SW12G

Washington, D.C. 20507

BY FACSIMILE:

Fax No. (202) 663-7022

FOOTNOTES:

1 - On May 5, 2014, the Complainant filed a MSPB appeal due to the issuance of a Notice of Decision to Remove the Complainant from service dated for April, 2014.

2 - The request to stay proposal to terminate is dated January 7, 2013, however it

relates only to events that occurred after that date. See ROI 254.  Further, Agency Exhibit 9 references this same document and confirms it was received on February 7, 2014, therefore the letter appears to be incorrectly dated for January 7, 2013 and is assumed to be sent on approximately February 7, 2014.

3 - The undersigned finds she has already addressed the issue of the Complainant being discriminated based on his race, sex and EEO activity as it relates to the termination of his training previously and therefore, the undersigned will not again address this claim.

- - - - -

C E R T I F I C A T E

STATE OF GEORGIA:

DEKALB COUNTY:

I hereby certify that the foregoing transcript was produced and that the foregoing pages 1 through 58 represent a true and correct transcript. I further certify that I am not of kin or counsel to the parties in the case; am not in the regular employ of counsel for any of said parties; nor am I anywise interested in the result of said case.

This, the 30th day of July, 2015.

RENEE BERGERON-TEEL, CCR-RDR
CCR NO. B1723

Jarvis Mosley
5826 Union Walk D
Union City, GA 30291



U.S. POSTAGE
PAID
UNION CITY, GA
30291
FEB 26, 16
AMOUNT
**$6.85**
R2305K138923-05

1004    20439



PRIORITY® MAIL
UNITED STATES POSTAL SERVICE
Visit us at usps.com
Label 107R, January 2008

United State Court of Federal Claims
ATT Clerk office
717 Madison Pl NW
Washington, DC 20439

**RECEIVED**

FEB 2 9 2016

OFFICE OF THE CLERK
U.S. COURT OF FEDERAL CLAIMS

Expected Delivery Day: 02/29/2016
**USPS TRACKING NUMBER**

Jarvis Mosley
5826 Union Walk D
Union City, GA 30291



U.S. POSTAGE
PAID
UNION CITY, GA
30291
FEB 28, 16
AMOUNT
**$6.85**
R2305K138923-05

1004    20439



United State Court of Federal Claims
ATT Clerk office
717 Madison Pl NW
Washington, DC 20439

RECEIVED

FEB 29 2016

OFFICE OF THE CLERK
U.S. COURT OF FEDERAL CLAIMS

Expected Delivery Day: 02/29/2016

**USPS TRACKING NUMBER**



9505 5134 3853 6057 0769 36